UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

SAURI J. MOREL,

                         Plaintiff,

          - against -

SPECIAL AGENT DANIEL REED, Immigration and
Customs Enforcement ("ICE") Narcotics Smuggling Unit,
SPECIAL AGENT JOHN LATTUCA, ICE Narcotics
Smuggling Unit, SPECIAL AGENT MICHAEL
FERNANDEZ, ICE Narcotics Smuggling Unit,

                      Defendants.

No. 11-cv-01808-DLI-LB
[Lead Case]


**ORAL ARGUMENT
REQUESTED**

------------------------------------------------------------------ X

SAURI J. MOREL,

                         Plaintiff,

          - against -

UNITED STATES OF AMERICA,

                      Defendant.

No. 12-cv-05145-DLI-LB
[Consolidated Case]

------------------------------------------------------------------- X


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**


                      CLEARY GOTTLIEB STEEN & HAMILTON LLP
                      One Liberty Plaza
                      New York, New York
                      Telephone: (212) 225-2000
                      Facsimile: (212) 225-3999

                      Attorneys for Plaintiff Sauri J. Morel

February 18, 2014

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ........................................................................................................ 2

    I.      DUE TO MR. MOREL'S WIFE'S ILLNESS, HE PROCURES A SECOND JOB
           WORKING FOR GREEN MARKET ................................................................................ 2

    II.     WHILE PICKING UP HIS SECOND BREADFRUIT SHIPMENT AT JFK FOR
           GREEN MARKET, MR. MOREL IS ARRESTED ........................................................ 3

    III.    AFTER MR. MOREL IS FIRST INTERVIEWED BY ICE AGENTS GOLDSTEIN
           AND LEUNG, THE USAO DECLINES PROSECUTION FOR INSUFFICIENT
           EVIDENCE ........................................................................................................................ 4

    IV.    AGENTS LATTUCA AND REED RE-ARREST MR. MOREL IMMEDIATELY
           FOLLOWING THE DECLINATION OF PROSECUTION, INTERROGATE HIM
           FOR HOURS, AND VIOLATE HIS CONSTITUTIONAL RIGHTS .......................... 5

    V.     DEFENDANTS DO NO FURTHER MEANINGFUL INVESTIGATION AND
           INSTEAD PROSECUTE MR. MOREL BASED UPON THEIR FALSIFIED
           INCRIMINATING STATEMENTS ................................................................................ 6

SUMMARY JUDGMENT STANDARD .................................................................................. 7

ARGUMENT .............................................................................................................................. 8

    I.      GENUINE ISSUES OF MATERIAL FACT REQUIRE A TRIAL ON MR.
           MOREL'S FALSE ARREST CLAIMS ........................................................................ 8

      A.    A Reasonable Juror Could Find That Agents Lattuca And Reed Lacked Probable
             Cause When They Re-arrested Mr. Morel On June 21, 2009 After Prosecution Had
             Been Declined *For Insufficient Evidence* ...................................................................... 9

      B.    Defendants Lacked Probable Cause To Re-Arrest Mr. Morel On June 23rd ............. 14

    II.     GENUINE ISSUES OF MATERIAL FACT REQUIRE A TRIAL ON MR.
           MOREL'S MALICIOUS PROSECUTION CLAIMS .................................................. 15

      A.    The Evidence That Defendants Fabricated A Confession Establishes A Malicious
             Prosecution Claim ............................................................................................................ 16

      B.    Defendants' Remaining Arguments Concerning Malicious Prosecution Also Fail ..... 17

         1.    Defendants "Initiated" The Prosecution ................................................................ 17

         2.    Defendants' Argument That They Had Probable Cause To Initiate And Continue
             The Prosecution Of Mr. Morel As A Matter Of Law Is Flawed On Numerous
             Levels ...................................................................................................................... 19

            a.    The Presumption Of Probable Cause Created By The Indictment Can Be, And
                  Is, Rebutted Here .............................................................................................. 19

ii

b.      In The Malicious Prosecution Context, "Probable Cause" Means Probable Cause To Believe The Prosecution Could Succeed, Which Defendants Lacked Here ........................................................................................................... 21

3.      A Reasonable Juror Could Find That Defendants Acted With The Requisite Malice ................................................................................................................. 23

III.      DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY ................... 24

CONCLUSION .................................................................................................................... 25

APPENDIX A ................................................................................................................... A-1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Cases</u>

Amnesty Am. v. Town of W. Hartford,
361 F.3d 113 (2d Cir. 2004)......................................................................... 8

Blasini v. City of N.Y.,
No. 11 Civ. 3022 (SAS), slip op. (S.D.N.Y. Apr. 18, 2012) ............................................. 20

Boyd v. City of N.Y.,
336 F.3d 72 (2d Cir. 2003).................................................................... passim

Brown v. City of N.Y.,
459 N.Y.S.2d 589 (1st Dep't 1983) ................................................................. 22

Brewton v. City of N.Y.,
550 F. Supp. 2d 355 (E.D.N.Y. 2008) ......................................................8, 9, 12, 14

Cameron v. City of N.Y.,
598 F.3d 50 (2d Cir. 2010).................................................................... 19, 24

Colon v. City of N.Y.,
60 N.Y.2d 78 (1983) ................................................................................. 19

Coggins v. Cnty. of Nassau,
-- F. Supp. 2d --, No. 07-CV-3624 (JFB)(AKT), 2013 WL 6224631 (E.D.N.Y. Dec. 2,
2013) ................................................................................................ 20

Curry v. City of Syracuse,
316 F.3d 324 (2d Cir. 2003)........................................................................ 9

Davis v. City of N.Y.,
-- F. Supp. 2d --, No. 10 Civ. 0699 (SAS), 2013 WL 1288176 (S.D.N.Y. Mar. 28, 2013)    12

Del Col v. Rice,
No. 11 CV 5138(MKB), 2012 WL 6589839 (E.D.N.Y. Dec. 18, 2012)......................... 20

Essig v. United States,
675 F. Supp. 84 (E.D.N.Y. 1987) ................................................................. 17

Frederick v. City of N.Y.,
No. 11 Civ. 469 (JPO), 2012 WL 4947806 (S.D.N.Y. Oct. 11, 2012)............................ 21

Gordon v. City of N.Y.,
No. 10-CV-5148 (CBA) (LB), 2012 WL 1068023 (E.D.N.Y. Mar. 29, 2012) (Amon,
C.J.)................................................................................................ 11, 12

Hewitt v. City of N.Y.,
No. 09 CV 214 (RJD)(MDG), 2012 WL 4503277 (E.D.N.Y. Sept. 28, 2012) ............... 20

Jocks v. Tavernier,
216 F.3d 128 (2d Cir. 2003)............................................................................................. 17

Kerman v. City of N.Y.,
261 F.3d 229 (2d Cir. 2001)........................................................................................... 9, 13

Llerando-Phipps,
390 F. Supp. 2d 372 (S.D.N.Y. 2005)........................................................................... 23-24

Lowth v. Town of Cheektowaga,
82 F.3d 563 (2d Cir. 1996)........................................................................................... 13, 23

Manganiello v. City of N.Y.,
612 F.3d 149 (2d Cir. 2010)........................................................................... 17, 19, 20, 24

Marshall v. Randall,
719 F.3d 113 (2d Cir. 2013)............................................................................................. 21

Martin v. City of Albany,
42 N.Y.2d 13 (1977)......................................................................................................... 24

Matthews v. City of N.Y.,
889 F. Supp. 2d 418 (E.D.N.Y. 2012) ............................................................................. 19

McClellan v. Smith,
439 F.3d 137 (2d Cir. 2006)......................................................................... 9, 19, 24-25

Mejia v. City of N.Y.,
119 F. Supp. 2d 232 (E.D.N.Y. 2000) ....................................................... 18, 22, 24

Milfort v. Prevete,
922 F. Supp. 2d 398 (E.D.N.Y. 2013) ............................................................................... 8

Murphy v. Lynn,
118 F.3d 938 (2d Cir. 1997)......................................................................................... 16, 20

O'Neill v. Krzeminski,
839 F.2d 9 (2d Cir.1988)................................................................................................... 18

Pacicca v. Stead,
456 F. App'x 9 (2d Cir. 2011) ......................................................................................... 18

Patterson v. Cnty. of Oneida, N.Y.,
375 F.3d 206 (2d Cir. 2004)............................................................................................... 8

v

Posr v. Court Officer Shield No. 207,
180 F.3d 409 (2d Cir. 1999)............................................................................... 21-22

Quinn v. City of N.Y.,
No. 99-CV-7068 (JBW), 2003 WL 1090205 (E.D.N.Y. Mar. 12, 2003) ........................ 12

Rehberg v. Paulk,
132 S.Ct. 1497 (2012)................................................................................... 20, 21

Ricciuti v. N.Y.C. Transit Auth.,
124 F.3d 123 (2d Cir. 1997)............................................................................. passim

Richardson v. City of N.Y.,
No. 02-CV-3651 (JG), 2006 WL 2792768 (E.D.N.Y. Sept. 27, 2006) ................... 2, 17, 24

Rodriguez v. City of N.Y.,
72 F.3d 1051 (2d Cir. 1995).................................................................................... 11

Rounseville v. Zahl,
13 F.3d 625 (2d Cir. 1994)................................................................................. 23, 24

Sankar v. City of N.Y.,
867 F. Supp. 2d 297 (E.D.N.Y. 2012) .............................................................. 8, 13, 22

Sankar v. City of N.Y.,
No. 07 CV 4726 (RJD)(SMG), 2012 WL 2923236 (E.D.N.Y. July 18, 2012) ............... 21

Tabaei v. N.Y.C. Health & Hosp. Corp.,
No. 11 Civ. 2013 (JSR), 2012 WL 5816882 (S.D.N.Y. Nov. 14, 2012) ...................... 18, 20

United States v. Freeman,
735 F.3d 92 (2d Cir. 2013)....................................................................................... 9

United States v. Valentine,
539 F.3d 88 (2d Cir. 2008)................................................................................... 9, 10

Weyant v. Okst,
191 F.3d 845 (2d Cir. 1996)............................................................................... passim

Zahrey v. Coffey,
221 F.3d 342 (2d Cir. 2000)..................................................................................... 25

Zellner v. Summerlin,
494 F.3d 344 (2d Cir. 2007)............................................................... 9, 10, 14, 24

Plaintiff Sauri J. Morel ("Mr. Morel") respectfully submits this memorandum of law, together with the accompanying Response to Defendants' Statement Pursuant to Local Civil Rule 56.1, Statement of Additional Material Facts Pursuant to Local Civil Rule 56.1 ("Pl's 56.1"), and Declaration of Jacqueline M. Moessner and the exhibits annexed thereto, in opposition to defendants' motion for summary judgment.[1]

## PRELIMINARY STATEMENT

Mr. Morel, a U.S. citizen with no prior criminal history, was falsely arrested, denied his constitutional right to counsel, and maliciously prosecuted by the defendants, who detained Mr. Morel immediately after the U.S. Attorney's Office ("USAO") had declined prosecution of him and then fabricated a confession that Mr. Morel had knowingly imported narcotics that Mr. Morel never made. To secure a conviction of Mr. Morel they knew to be unjust, defendants repeated this false confession to the prosecutor, the grand jury, to the Court in a suppression hearing, and to the jury that acquitted Mr. Morel. Aside from being squarely contradicted by Mr. Morel's consistent testimony at the suppression hearing, his criminal trial, and in his deposition in this case that he never made any such incriminating statements, defendants' own testimony concerning the purported confession, which was never recorded or acknowledged by Mr. Morel and which no one else heard, has been inconsistent and contradictory.

Defendants assert that they "must assume, for the purpose of this motion only, that the plaintiff did not [confess to knowing that he was transporting drugs]." See Defs.' Br. at 12 n.3. In other words, defendants concede that, for purposes of this motion, defendants' statements to the prosecutor and sworn testimony about the purported confession upon which prosecution

---

[1] Citations to Plaintiff's Response to Defendants' Statement Pursuant to Local Civil Rule 56.1 are in the format "Resp. 56.1 ¶ __." Citations to exhibits are in the format  "Ex. __." Exhibits 1 to 43 are attached to the Declaration of Jacqueline M. Moessner, and Exhibits A to O are attached to the Declaration of Seth D. Eichenholtz. Citations to defendants' memorandum of law are in the format "Defs.' Br. at __."

depended <u>were a lie</u>. This concession conclusively ends their summary judgment motion for the malicious prosecution claim. The Second Circuit has clearly held that "[n]o arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee." <u>Ricciuti v. N.Y.C. Transit Auth.</u>, 124 F.3d 123, 130-31 (2d Cir. 1997).  Where there is evidence of fabrication, the presumption of probable cause is overcome, and "the existence of probable cause based on non-fabricated evidence ceases to be a defense for the fabricator." <u>Richardson v. City of N.Y.</u>, No. 02-CV-3651(JG), 2006 WL 2792768, (E.D.N.Y. Sept. 27, 2006).

Nor is defendants' motion appropriate on the false arrest claims. Probable cause for an arrest may be determined on summary judgment only where "there is <u>no dispute</u> as to the pertinent events and the knowledge of the officers." <u>Weyant v. Okst</u>, 191 F.3d 845, 852 (2d Cir. 1996) (emphasis added). Here, the defendants rearrested Mr. Morel on June 21, 2009 immediately after the U.S. Attorney's Office declined prosecution for lack of incriminating statements, despite having no additional evidence; chose to purposefully blind themselves to the DEA's knowledge from months of investigation that there was no evidence of Mr. Morel's involvement in the drug trafficking conspiracy; and rearrested Mr. Morel again on  June 23, 2009 based on the falsified confession, which clearly raises a jury issue as to whether defendants knew that they lacked probable cause absent an incriminating statement. There are clearly disputed issues of material fact "as to the pertinent events and the knowledge of the officers."

**STATEMENT OF FACTS**

**I.    DUE TO MR. MOREL'S WIFE'S ILLNESS, HE PROCURES A SECOND JOB WORKING FOR GREEN MARKET**

In 2009, Mr. Morel lived with his wife Idaliza Morel and his five-year-old daughter Sairy in Paterson, New Jersey, the town in which Mr. Morel was raised.  Pl's 56.1 ¶ 1. Mr. Morel

2

worked full time as a DirecTV satellite technician, while his wife worked part time, to support their family.  Id. ¶¶ 2-3, 5-7. In early 2009, after his wife became too ill with a heart condition to continue working, Mr. Morel began a search for additional part-time work to supplement the family's income. Id. ¶¶ 8-9. On June 11, 2009, Mr. Morel responded to a classified ad in the newspaper El Diario which stated (in Spanish): "Driver with experience in the Bronx and Manhattan area, part time, good salary and expenses, call 646-530-5502." Id. ¶¶ 11-12. After submitting a written application and being interviewed by the owner of Green Market Corporation ("Green Market"), Mr. Morel was hired as a part-time driver. Id. ¶¶ 12-20.

Mr. Morel's job consisted of picking up one or two produce shipments a week from John F. Kennedy International Airport ("JFK") and delivering them to Green Market's offices in Yonkers, for which Mr. Morel was to be paid a salary of $500 per week. Id. ¶¶ 13, 19. On the day that he was hired, Mr. Morel drove to JFK and picked up over 100 sacks of breadfruit, which he delivered two-days later to Green Market due to conflicts with his primary job. Id. ¶¶20-26. Mr. Morel's boss at Green Market was unhappy with the delay and informed Mr. Morel that he needed to be more prompt on the next delivery; he also gave Mr. Morel a company cell phone so that Mr. Morel would be more reachable. Id. ¶¶ 26-28.

## II.    WHILE PICKING UP HIS SECOND BREADFRUIT SHIPMENT AT JFK FOR GREEN MARKET, MR. MOREL IS ARRESTED

The next time Mr. Morel was told to pick up a fruit shipment, he brought his friend Henry Acosta due to the size of the first shipment and promised to him half of the $500 he earned from Green Market that week. Id. ¶¶ 32-33. After twice being turned away at JFK because the shipment was not ready, Mr. Morel returned on the afternoon of June 21, 2009, completed paperwork, provided his government-issued ID, and then he and Mr. Acosta began loading the breadfruit into Mr. Morel's van. Id. ¶¶ 33-38, 58. Suddenly, Messrs. Morel and

Acosta were surrounded at gunpoint, arrested, and taken into custody for questioning. Id. ¶¶ 60-61.

Unbeknownst to Mr. Morel, as a result of intelligence passed by the Drug Enforcement Administration ("DEA"), Customs and Border Patrol ("CBP") officers and Immigration and Customs Enforcement ("ICE") agents had seized cocaine hidden inside two breadfruit shipments, including the one Mr. Morel was to pick up for Green Market,[2] in the early morning hours of June 21, 2009. Id. ¶ 39. The DEA had anticipated these shipments of narcotics and had learned the identities of the persons responsible for them through an extensive investigation involving the use of wiretaps, surveillance, and ███████████████ Id. ¶¶ 40-46. Notwithstanding that the DEA had provided this intelligence to ICE and CBP and had explicitly requested to be informed when such shipments were seized, ICE and CBP falsely claimed that the seizures were a "cold hit," i.e., made without prior intelligence, so that ICE would not have to turn over the investigation to the DEA and could instead claim credit for any arrests.[3] Id. ¶¶ 44-53, 88-91.

## III.   AFTER MR. MOREL IS FIRST INTERVIEWED BY ICE AGENTS GOLDSTEIN AND LEUNG, THE USAO DECLINES PROSECUTION FOR INSUFFICIENT EVIDENCE

Following his arrest while loading the shipment, Mr. Morel was interviewed by ICE Agents Andrew Goldstein and Meredith Leung. Id. ¶ 61. Mr. Morel at all times truthfully answered their questions and explained the circumstances that brought him to JFK that day, beginning with his response to Green Market's classified ad after his wife had become ill. Id. ¶¶ 63-68. Mr. Morel provided all pertinent information he knew, including Green Market's location

---

[2] Three other individuals unknown to Mr. Morel who came to pick up the other shipment at JFK on June 21, 2009 were also arrested. Pl's 56.1 ¶¶ 56-57.

[3] In fact, the DEA specifically requested to take over the investigation because they believed, based upon their months of investigation, that these shipments related to their investigation; Agent Lattuca, despite having almost no information about the seizure, said "absolutely not." Id. ¶ 91.  To do so would have deprived ICE of credit for the historical seizure. Ultimately, after fighting, the DEA and ICE agreed that they were "sharing the statistics of the five arrests" which meant that they "would both be taking credit for the arrest [of the five people on June 21]" (Id. ¶ 97) and Agent Lattuca permitted the DEA to "tag along" and receive information from ICE. Id.

and description, the names and phone numbers of its employees, his salary, his job responsibilities, and the fact that he knew nothing about any drugs, the presence of which he first learned of during this interview.[4] Id. Mr. Morel also described his prior delivery for Green Market and provided the phone he had received from Green Market to the agents. Id. After this initial interview, as well as interviews of the other four individuals arrested that day, ICE agents informed the USAO of the circumstances of the arrests and what was said in interviews. Id. ¶¶ 69 -70. The USAO declined prosecution on the grounds that there was insufficient evidence against all five arrestees, including Mr. Morel, noting the lack of incriminating statements.  Id. ¶¶ 70-72.

## IV.   AGENTS LATTUCA AND REED RE-ARREST MR. MOREL IMMEDIATELY FOLLOWING THE DECLINATION OF PROSECUTION, INTERROGATE HIM FOR HOURS, AND VIOLATE HIS CONSTITUTIONAL RIGHTS

Following the interview, Agents Goldstein and Leung ceased being involved in the investigation, and ICE Special Agents John Lattuca and Daniel Reed of the JFK Narcotics Smuggling Unit took over the case ("Lattuca and Reed"). Id. ¶ 73. Even though Lattuca and Reed were informed of the USAO's decision to decline prosecution for lack of incriminating statements, and accordingly released the other four individuals, they did not release Mr. Morel. Instead, despite having no evidence beyond what the USAO had considered insufficient, they arrested Mr. Morel for a second time by taking him into custody and keeping him handcuffed for the rest of the night while they aggressively questioned him in at least two separate interrogations. Id. ¶¶ 74-77. They singled out Mr. Morel not because the evidence of his alleged involvement differed from the other four arrestees but because they thought he was less "versed with the criminal justice system" and because he had been more cooperative and forthcoming in his interview. Id. ¶ 80. During these interrogations, Mr. Morel's explicit requests for a lawyer

---

[4] Contrary to defendants' insinuation that Mr. Morel informed the agents that he had been "hired on a part-time basis as a delivery person for a company called Green Market even though he had a suspended license," Defs.' Br. at 4 (emphasis added), the status of his license was never raised in any of Mr. Morel's interviews. Resp. 56.1 ¶ 26.

were ignored in violation of his constitutional rights, as Judge Matsumoto later found in the underlying criminal case. Id. ¶ 86.

When questioned by Lattuca and Reed, Mr. Morel again repeated the same information he had provided Goldstein and Leung before the USAO had declined prosecution, including details about his employment at Green Market, the fact that he was being paid $500 a week, and the fact that he had no knowledge that the produce shipment contained drugs. Id. ¶¶ 82-85. Although DEA agents were present and had a wealth of information concerning the criminal organization responsible for the narcotics that had been seized (none of which connected Mr. Morel in any way to that organization) Reed and Lattuca purposefully did not ask them about any of their intelligence. Id. ¶¶ 92-93.

After Lattuca and Reed realized that Mr. Morel was not going to confess despite their repeated, aggressive questioning, and knowing that prosecution had already been declined because Mr. Morel had not made any "incriminating statements," they simply fabricated a confession. Id. ¶ 100. ██████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████. Id. ¶¶ 101-03. After providing this false confession to the USAO, prosecution of Mr. Morel was "deferred" and Mr. Morel was released. Id. ¶ 104.

## V. DEFENDANTS DO NO FURTHER MEANINGFUL INVESTIGATION AND INSTEAD PROSECUTE MR. MOREL BASED UPON THEIR FALSIFIED INCRIMINATING STATEMENTS

In the days following Mr. Morel's release, Lattuca and Reed made no meaningful attempts to further their investigation, and cannot consistently explain what, if anything, they were planning to do to investigate. Id. ¶ 111-12. They did not visit Green Market, or seek out DEA intelligence. Id. Instead, the agents ordered Mr. Morel to return to ICE's offices on June 23, despite recognizing that he had no legal obligation to do so. Id. ¶ 113-14. Once there, Mr.

Morel repeated the same truthful information he had previously told Reed and Lattuca, namely that he had no knowledge of drugs and was being paid $500 per week by Green Market, but Reed and Fernandez accused Mr. Morel of "recanting" his confession and rearrested him despite lacking any additional information. Id. ¶¶ 116-19.

Based on the fabricated statements that defendants forwarded to the USAO both on June 21 and June 23, the USAO authorized prosecution of Mr. Morel for knowingly and intentionally importing narcotics. Id. ¶ 122. In furtherance of that prosecution, Reed swore to the criminal complaint, Reed testified as to the invented incriminating statements before the grand jury, Reed and Lattcua testified at Mr. Morel's suppression hearing, and all defendants testified at Mr. Morel's trial,[5] where the alleged incriminating statements were the only evidence against Mr. Morel beyond that which the USAO had found to be "insufficient" when it declined prosecution. Id. ¶¶ 123-29, 144, 147-48. The jury acquitted Mr. Morel.[6] Id. ¶ 155.

While Mr. Morel was unlawfully confined, his life was upended:  his wife passed away from her illness and he was denied the chance to pay his last respects; his five-year old daughter, born and raised in the United States, was practically left orphaned, and sent to the Dominican Republic to live with relatives. Id. ¶ 140-42. Although Mr. Morel had maintained steady employment as a satellite technician prior to his false arrest, tarred with the stigma of the prosecution, Mr. Morel has been unable to find stable work since his release. Id. ¶ 152-54.

### SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate only where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Boyd v. City of

[5] Defendants have also testified about these supposed statements in their depositions in this case. There are significant inconsistences in their testimony, both internally and compared to each other's testimony. Appendix A to this brief provides a chart showing examples of the significant inconsistencies in their testimony.
[6] While Mr. Morel was awaiting trial, DEA agents arrested and successfully prosecuted the actual criminals behind the narcotics seized on June 21, 2009 who are the same criminals the DEA knew of the day of the seizure. There was no connection between these individuals and Mr. Morel.

N.Y., 336 F.3d 72, 75 (2d Cir. 2003) (citing Fed. R. Civ. P. 56(c)). The moving party bears the burden of demonstrating their entitlement to summary judgment through citation to admissible evidence. See Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 219-20 (2d Cir. 2004). In evaluating a motion for summary judgment, all reasonable inferences must be drawn and all facts must be construed in the light most favorable to the nonmoving party. See Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir. 2004). A court is "not entitled, on a motion for summary judgment, to credit [defendants'] version of the facts and enter judgment based on its own view that their version was more likely true." Weyant v. Okst, 101 F.3d 845, 855 (2d Cir. 1996); Milfort v. Prevete, 922 F. Supp. 2d 398, 406 (E.D.N.Y. 2013) ("credibility conflicts and choices between conflicting versions of the facts are matters for the jury.").

## ARGUMENT

## I.   GENUINE ISSUES OF MATERIAL FACT REQUIRE A TRIAL ON MR. MOREL'S FALSE ARREST CLAIMS

False arrest requires that Mr. Morel show "(1) the defendant[s] intended to confine [him], (2) [he] was conscious of the confinement, (3) [he] did not consent to the confinement, and (4) the confinement was not otherwise privileged [e.g., by probable cause]." Weyant, 191 F.3d at 853 (citation omitted). Defendants concede all but the fourth element. Probable cause for an arrest may be determined on summary judgment only where "there is no dispute as to the pertinent events and the knowledge of the officers." Id. (emphasis added).  Where, as here, there are genuine disputes on these issues, the Court may not weigh the evidence to determine whether it is "more likely than unlikely" that defendants had probable cause – that is a question for the jury. See id. at 854-55; accord Sankar v. City of N.Y., 867 F. Supp. 2d 297, 307 (E.D.N.Y. 2012); Brewton v. City of N.Y., 550 F. Supp. 2d 355, 366-67 (E.D.N.Y. 2008).

8

If an arrest is made without a warrant, "the officer has acted outside the scope of the legal process and therefore a rebuttable presumption arises that such an arrest is unlawful. The defendant has the burden of raising and proving the affirmative defense of probable cause." Curry v. City of Syracuse, 316 F.3d 324, 335 (2d Cir. 2003).[7] Probable cause is evaluated based only on the facts the officer knows at the time of the arrest, see Zellner v. Summerlin, 494 F.3d 344, 369 (2d Cir. 2007), or that the officer deliberately ignores, Kerman v. City of N.Y., 261 F.3d 229, 241 (2d Cir. 2001), and exists when those facts "are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." Zellner, 494 F.3d at 368. Probable cause requires more than "mere suspicion" or the possibility of criminal activity, it requires "a probability or substantial chance." United States v. Valentine, 539 F.3d 88, 93 (2d Cir. 2008).[8]

**A. A Reasonable Juror Could Find That Agents Lattuca And Reed Lacked Probable Cause When They Re-Arrested Mr. Morel On June 21, 2009 After Prosecution Had Been Declined *For Insufficient Evidence***

The Court's "first task is to determine when the 'arrest[s]' took place." Brewton, 550 F. Supp. 2d at 365. Mr. Morel was arrested three times. The first arrest, when Mr. Morel was loading the breadfruit shipment into his van, did not involve any of the defendants here and is not at issue on this motion.[9] However, for the reasons discussed below, probable cause was lacking

---

[7] Defendants' reliance on the presumption of probable cause created by the indictment applies only to malicious prosecution claims. Any application of such a presumption to a false arrest claim is "totally misplaced." McClellan v. Smith, 439 F.3d 137, 145 (2d Cir. 2006).
[8] Even the lesser standard of "reasonable suspicion" sufficient for a "Terry stop" must be "based on specific and articulable facts" and not on "inchoate suspicion or mere hunch." United States v. Freeman, 735 F.3d 92, 96 (2d Cir. 2013). Thus, defendants' generalized hunches are not sufficient to justify their actions here. Compare Valentine, 539 F.3d at 96 n.9 (rejecting government's argument that officers required only "reasonable suspicion" because they arrested, not merely stopped, suspect) with Defs.' Br. at 10 ("The officer need only have reasonable cause to believe that the arrestee was committing or had committed an offense" (emphasis added)).
[9] Defendants' suggestion that Mr. Morel has effectively conceded probable cause for the first arrest, see Defs.' Br. at 13, is baseless. The validity of that arrest, in which defendants were not involved, is not at issue here. Defendants must establish that they had probable cause each of the two times they arrested Mr. Morel.

9

for the second arrest on June 21, 2009 by Agents Reed and Lattuca and for the third arrest on

June 23, 2009 by all defendants.

In support of their request to file a motion to dismiss, defendants cited cases purportedly

standing for the proposition that "requesting and then loading a shipment that law enforcement

knew contained narcotics, in and of itself" is sufficient to establish probable cause.[10] Plaintiff

opposed this request arguing that none of the cases defendants cited actually supported that

proposition.[11] The Court was persuaded that this case did not "sound like [Federal] Rule [of Civil

Procedure] 12."[12] Here, instead, defendants list five purported factors that they argue gave them

probable cause. Defs.' Br. at 11-12.[13] But factors one and two simply rehash the already-rejected

argument that merely picking up drugs is sufficient "in and of itself" to establish probable cause,

and factors three, four, and five involve disputed issues of fact and impermissibly ask the Court

to draw inferences and make credibility determinations in their favor. Cf. Zellner, 494 F.3d 374;

Valentine, 539 F.3d at 95.  Similarly, defendants' repeated assertion that Mr. Morel picked up

the shipment "under circumstances that imply his knowledge" that it contained narcotics, see,

e.g., Defs.' Br. at 13, is merely circular. The only undisputed "circumstance" is the fact that Mr.

Morel picked up the shipment of breadfruit, but that is insufficient to establish probable cause in

light of all the facts known to defendants. Moreover, it would be error for the Court to focus

"solely on the core of facts as to which there was no dispute . . . when there exist disputes as to

---

[10] Defs.' Letter to Judge Dearie dated Dec. 17, 2012, Morel v. Reed 1:12-cv-01808 (DLI-LB), ECF No. 43, at 4.
[11] Pl's Letter to Judge Dearie dated Dec. 21, 2012, Morel v. Reed, 1:11-cv-01808 (DLI-LB), ECF No. 45, at 4, n.5.
[12] See Transcript of Civil Cause for Pre Mot. Conf. dated Jan. 14. 2013, ECF No. 48. at 10:21-23, 13:4-7.
[13] The five "factors" are:  "(1) [Lattuca and Reed] were told by other law enforcement officials that, as part of a 'controlled delivery' operation, plaintiff specifically requested and picked up a large shipment that law enforcement knew contained over 270 [sic] pounds of cocaine; . . . (2) they were told by other law enforcement officials that plaintiff was observed loading the shipment that was known to contain over 230 pounds of cocaine into plaintiff's truck, . . . (3) based on the experience of Lattuca, and other law enforcement officials, individuals who are hired to pick up such large shipments of drugs are usually aware that they are transporting drugs . . . (4) they were told by Agent Goldstein that plaintiff's behavior after his arrest indicated that he was knowingly picking up a large shipment of drugs . . . and (5) Agent Lattuca believed that plaintiff was not being truthful with them, based on his demeanor and some strange answers to their questions . . . ." Defs.' Br. at 12.

10

related facts that would permit competing inferences to be drawn as to the meanings of undisputed events." Rodriguez v. City of N.Y., 72 F.3d 1051, 1064 (2d Cir. 1995).

At the time Lattuca and Reed arrested Mr. Morel, based on the totality of the circumstances of which they were aware, they lacked probable cause. Following Mr. Morel's initial arrest and interview with Goldstein and Leung, the facts of his case were presented to the USAO, which declined prosecution for lack of incriminating statements as there was insufficient evidence to conclude that there was a probability or substantial chance that Mr. Morel was a knowing participant in a drug smuggling conspiracy. Pl's 56.1 ¶¶ 70-71.  Shortly thereafter, Lattuca and Reed became involved and, even though they were informed of the declination of prosecution, Id. ¶¶ 73-74, they did not release Mr. Morel. Instead, they rearrested and repeatedly questioned him for the rest of the night. On these facts, a reasonable juror could find that when Lattuca and Reed[14] arrested Mr. Morel on June 21 without any information beyond that which the prosecutor had already deemed insufficient, they lacked probable cause for the arrest. See Gordon v. City of N.Y., No. 10-CV-5148 (CBA) (LB), 2012 WL 1068023, at *5-7 (E.D.N.Y. Mar. 29, 2012) (Amon, C.J.) (finding a claim for false imprisonment for the 48 hours following the prosecutor's decision to decline prosecution "for lack of evidence"). [15]

Defendants now, despite the record, contend that there is no admissible evidence that prosecution was declined, or if it was, that it was ever communicated to defendants.  Defs.' Br. at 14. This is plainly untrue. First, defendants' own written reports admit that prosecution of Mr. Morel was initially declined due to the lack of incriminating statements. Pl's 56.1 ¶¶ 70-71. Second, at the suppression hearing, Reed testified multiple times that prosecution had initially

---

[14] Of course, Mr. Morel does not allege that Agent Fernandez is liable for this arrest in which he did not participate. Cf. Defs.' Br. at 11.

[15] Defendants' argument that the police need not release a suspect as soon as he denies involvement is a red herring. See Defs.' Br. at 13-14. Mr. Morel does not claim that he had to be released because he said there was no reason to hold him, but because the USAO made that determination.

been declined by the USAO. Id.  Third,  during the criminal case, the government itself represented to the Court that it had initially declined prosecution. Id.  Fourth, Reed admitted the declination again at his deposition in this case. Id.[16]

Defendants also raise a series of specious arguments about the nature of the declination. First, defendants argue that "a decision by the USAO not to prosecute does not mean that the USAO believed that probable cause was lacking" as it could have been due to "resource issues" or other theoretical reasons, Defs.' Br. at 14 & n.5, but here the government's own records reflect that prosecution was declined precisely because there was insufficient evidence, Pl's 56.1 ¶¶ 70-71. Second, defendants speculate that "it is clear. . . that the USAO wanted the agents to continue to investigate the case," Defs.' Br. at 14-15, but given the declination and surrounding facts, defendants claim is far from undisputed. Third, defendants suggest that the declination decision was a mere "opinion" with which they were free to disagree. See id. The notion that law enforcement agents may ignore the government's decision not to prosecute someone and, absent new evidence, shackle and detain that person is both dubious and unsupported by defendants.

In reality, there are clearly contested issues of fact as a reasonable juror could find that there was insufficient evidence for Lattuca and Reed to arrest Mr. Morel.[17] For example, at the time they arrested Mr. Morel immediately following the declination decision, a jury could find that Lattuca and Reed knew:

---

[16] Defendants cite no case in support of their argument that, as a matter of law, the police are entitled to keep a citizen in custody following a prosecutor's decision to decline prosecution for insufficient evidence, and  plaintiff is not  aware of any. Courts sometimes note that a subsequent declination cannot be used by a false-arrest plaintiff to establish that a prior arrest was made without probable cause. See Davis v. City of N.Y., -- F. Supp. 2d --, No. 10 Civ. 0699 (SAS), 2013 WL 1288176, at *12 n.123 (S.D.N.Y. Mar. 28, 2013); Quinn v. City of N.Y., No. 99-CV-7068 (JBW), 2003 WL 1090205, at *4 (E.D.N.Y. Mar. 12, 2003). Here, by contrast, defendants argue that a prior declination decision has no bearing on an immediately subsequent arrest. On summary judgment, this argument cannot withstand scrutiny. See Gordon, 2012 WL 1068023, at *5-7.

[17] Probable cause in this context requires a reasonable belief that Mr. Morel probably knew about those narcotics as he was charged with "knowingly and intentionally conspir[ing] to import a controlled substance." See Brewton, 550 F. Supp. 2d at 365 (because "reporting false information in a police incident report is not a crime absent the element of scienter, the Court finds that probably cause must be satisfied with respect to this element."); United States v. Morel, No. 09-cr-493 (KAM), Complaint, ECF No. 1 (June 24, 2009).

- The narcotics had not been visible to Mr. Morel when he was loading the breadfruit shipment into his van;

- Mr. Morel did not check for narcotics while loading the shipment nor did he provide a false name or documentation, appear nervous, check whether anyone was watching, or otherwise act in a manner that would provide circumstantial evidence that he was knowingly participating in illegal activity;

- The DEA did not believe Mr. Morel was involved in the drug trafficking conspiracy;

- Mr. Morel consistently and unequivocally denied any knowledge of narcotics in the initial interview, had plausibly explained how he had recently been hired as a driver to pick up what he believed to be fruit and vegetables for a salary of $500 per week, and during that interview had not acted in a manner from which an officer could reasonably infer that he was knowingly participating in illegal activity but rather was forthcoming and helpful, while seeking no leniency in return.

Moreover, although probable cause is determined based upon the facts available to the officer at the time, officers may not "deliberately ignore[] . . . opportunities to confirm" information they have reason to question but which they rely on to justify an arrest. See Kerman v. City of N.Y., 261 F.3d  229, 241 (2d Cir. 2001). Although once they possess probable cause, law enforcement does not have a duty to investigate all alibis, agents may not close their eyes to information available to them that may undermine that probable cause. See Lowth v. Town of Cheektowaga, 82 F.3d 563, 571 (2d Cir. 1996) ("the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause" (citation omitted)); Sankar, 867 F. Supp. 2d at 306-07.

Like the defendants in Kerman, Lattuca and Reed, faced with little incriminating evidence, unreasonably failed to confirm their alleged generalized suspicions about Mr. Morel through readily available means: asking the DEA agents whom they knew had considerable evidence including from wiretaps about this criminal organization about the drug organization of which they suspected Mr. Morel was part. The reason Reed and Lattuca did not do so is that this would necessarily mean they were conceding it was the DEA's case and they would not get

credit for the historic seizure. If Reed and Lattuca had, they would have learned of the DEA case agents' conclusion by the end of June 21st that there was insufficient evidence to hold Mr. Morel, that the DEA had no evidence of Mr. Morel's involvement, and the names of those who actually were involved. Pl's 56.1 ¶¶ 92-94.

Moreover, defendants inappropriately attempt to reconstruct probable cause based upon facts uncovered only during discovery in this litigation despite being limited to facts known by defendants at the time of the arrest.[18]  Specifically, defendants emphasize that Mr. Morel had a suspended license, and compare his full-time salary to the $500 he was making from Green Market to argue that a reasonable officer would infer that $500 was "very high" in comparison to what Mr. Morel usually earned. See Defs.' Br. at 13 & n.4. But there is no evidence that defendants were even aware of Mr. Morel's suspended license or that they ever asserted that his salary of $500 was "very high" in comparison to what he usually earned.[19] It is axiomatic that defendants cannot rely on facts not known to them to establish probable cause – the police may not, for example, retroactively justify a search by pointing to evidence of contraband discovered by the search. See Zellner, 494 F.3d at 375; Brewton, 550 F. Supp. 2d at 363-64.

### B.  Defendants Lacked Probable Cause To Re-Arrest Mr. Morel On June 23rd

Defendants also lacked probable cause when Mr. Morel was arrested again on June 23rd. First, during the lengthy interrogations that followed the declination on June 21, Mr. Morel forthrightly and consistently explained how he had recently been hired to pick up fruit and vegetables in his van for $500 per week and had not known or suspected anything about narcotics. Pl's 56.1 ¶¶ 82-83. Mr. Morel provided as much information as he had about the

---

[18] Although an officer's subjective reasons for making an arrest is not controlling in a probable cause analysis, Defs.' Br. at 10, that is inapposite here, as Mr. Morel claims that defendants had no basis at the time to find that defendants had probable cause.

[19] In fact, Lattuca specifically testified at his deposition that whether $500 is an exorbitant amount of money depends on the specifics of a person's financial circumstances and  he "didn't think either way if it was or wasn't a lot of money [to Mr. Morel]." Resp. 56.1 ¶ 27.

individuals for whom he worked, including their names, business address, phone numbers, physical descriptions, how they had hired him, and what they had asked him to do with the shipment. <u>Id.</u> ¶ 84. When it became clear to him that Lattuca and Reed were not interested in this information but wanted only to force him to confess to a crime he did not commit, he requested an attorney. <u>Id.</u> ¶ 86. Lattuca and Reed ignored this request by continuing their interrogation. <u>Id.</u> At the end of the night, unable to get a confession but knowing that prosecution had been declined without one, Lattuca and Reed simply fabricated one. <u>Id.</u> ¶¶ 87, 98-103. Obviously, fabricated evidence does not constitute probable cause.

Second, when Mr. Morel voluntarily returned without counsel to ICE's offices on the 23rd, Mr. Morel repeated the same true facts to Reed and Fernandez (who had learned no additional information in the intervening time) as he had to Reed and Lattuca two days earlier again providing no basis for probable cause. <u>Id.</u> ¶¶ 114-117. Yet Mr. Morel was placed under arrest, according to defendants' conflicting narratives, either because he recanted his previous incriminating statements, or because, just the opposite, he again made incriminating statements but refused or was unable to cooperate, <u>id.</u> ¶¶ 118-19.  There was no basis for this arrest as all of the evidence defendants knew or deliberately ignored tended to undermine any belief or suspicion about Mr. Morel's knowledge, including the fact that they knew they had fabricated a confession to secure prosecution.

## II.    GENUINE ISSUES OF MATERIAL FACT REQUIRE A TRIAL ON MR. MOREL'S MALICIOUS PROSECUTION CLAIMS

Malicious prosecution requires: (1) the defendant's initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause to believe the prosecution could succeed; and (4) malice as a motivation

for the defendant's actions. [20] See Boyd v. City of N.Y., 336 F.3d 72, 76 (2d Cir. 2003); Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997).

**A. The Evidence That Defendants Fabricated A Confession Establishes A Malicious Prosecution Claim**

Probable cause is not a defense to a malicious prosecution claim where defendants fabricate evidence and forward it to the prosecutor resulting in a deprivation of plaintiff's liberty. Here, defendants concede, for purposes of this motion that they fabricated the alleged incriminating statements, Def's Br. at 12 n.3,[21] but argue that the "prosecution need not rely on the allegedly 'false' statements made by defendants Reed and Lattuca." See Defs.' Br. at 21. Confronted with a strikingly similar argument, that "so long as there was probable cause for Alfred Ricciuti's arrest – independent of the allegedly fabricated evidence – the fabrication of evidence is legally irrelevant," Ricciuti, 124 F.3d at 129-30, the Second Circuit rejected it out of hand:

> This argument – an ill-conceived attempt to erect a legal barricade to shield police officers from liability – is built on the most fragile of foundations; it is based on an incorrect analysis of the law and at the same time betrays a grave misunderstanding of those responsibilities which the police must have towards the citizenry in an open and free society.  No arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee.  To hold that police officers, having lawfully arrested a suspect, are then free to fabricate false confessions at will, would make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice.  Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable 'corruption of the truth-seeking function of the trial process.'

---

[20] Except for certain differences noted below, the law applicable to malicious prosecution claims brought under Bivens is substantially the same as under New York law, which applies to Mr. Morel's Federal Tort Claims Act ("FTCA") malicious prosecution claim.

[21] To the extent that defendants attempt to retract this concession, defendants' motion for summary judgment still fails as there remain disputed issues of material fact and a jury must determine any issues of credibility. See, e.g., Milfort v. Prevete, 922 F. Supp. 2d 398, 406 (E.D.N.Y. 2013) ("credibility conflicts and choices between conflicting versions of the facts are matters for the jury.").

Id. at 130. This Court should similarly reject defendants' argument.

Notably, in Richardson v. City of New York, No. 02 CV 3651 (JG), 2006 WL 2792768 (E.D.N.Y. Sept. 27, 2008), Judge Gleeson concluded that Second Circuit precedent beginning with Ricciuti "stands for the proposition that on a malicious prosecution claim, if it can be proved that a law-enforcement officer fabricated material evidence against a suspect and forwarded it to prosecutors, causing the suspect to be deprived of his liberty, . . . then not only is the presumption of probable cause overcome, but the existence of probable cause based on non-fabricated evidence ceases to be a defense for the fabricator." Id. at *7 (emphasis added). See also Jocks v. Tavernier, 216 F.3d 128, 138 (2d Cir. 2003). Where, as here, there is evidence (and a concession) that (1) the police lied, (2) that lie caused the prosecution to proceed, and (3) the prosecution caused plaintiff to be deprived of his liberty, there is a genuine issue to be tried and summary judgment is inappropriate.

**B. Defendants' Remaining Arguments Concerning Malicious Prosecution Also Fail**

1. Defendants "Initiated" The Prosecution

Agent Reed concedes that he initiated the prosecution by swearing to a criminal complaint against Mr. Morel. See Defs.' Br. at 17 n.8. That is dispositive with respect to the United States and Agent Reed on the initiation element of Mr. Morel's FTCA claim for malicious prosecution. See Essig v. United States, 675 F. Supp. 84, 89 (E.D.N.Y. 1987) (under the FTCA, the United States is vicariously liable for tortious conduct of its employees when acting within the scope of their employment). While Lattuca and Fernandez argue that they did not initiate prosecution, a law enforcement agent can "initiate" a criminal proceeding by "preparing [an] alleged false confession and forwarding it to prosecutors." Ricciuti, 124 F.3d at 130; accord Manganiello v. City of N.Y., 612 F.3d 149, 163 (2d Cir. 2010). Here, a reasonable juror could find that (1) Lattuca and Reed together fabricated a false confession and relayed it to

17

the USAO on June 21st, and (2) Reed and Fernandez together fabricated a second false confession and relayed it to the USAO on June 23rd. All defendants, including Agent Fernandez, were thus sufficiently involved in "initiating" the prosecution to be liable for maliciously prosecuting Mr. Morel. See Ricciuti, 124 F.3d at 131 (defendant initiated prosecution where he "knowingly took part with [the other defendants] in the distribution of a confession he knew to be false, and [where] he, together with [the other defendants], lied about the circumstances surrounding [plaintiff's] arrest"). [22]

Lattuca argues that he cannot be considered an "initiator" because the USAO "may have relied" on evidence other than the fabricated statements, which he now argues "can support a decision to prosecute plaintiff." Defs.' Br. at 18-19 (emphasis added). [23] But, as explained above, in light of (1) the USAO's decision to decline prosecution because there were no incriminating statements, (2) the fact that Mr. Morel made no incriminating statements, (3) Lattuca's own admission that without the incriminating statements there was insufficient evidence to justify a prosecution, Pl's 56.1 ¶ 72, and (4) Lattuca's admission that the other June 21 Arrestees were released because they did not make any incriminating statements, id., there are clear issues of

---

[22] See also Mejia v. City of N.Y., 119 F. Supp. 2d 232, 272 (E.D.N.Y. 2000) ("[P]ersons who conspire with a complaining witness to manufacture evidence that is likely to influence the prosecutor's decision to commence proceedings and the jury's verdict are jointly liable for malicious prosecution."). To the extent Agent Fernandez did not participate in any call or meeting with the USAO, a reasonable juror could also find that Agent Fernandez, who knowingly participated with Agent Reed in fabricating incriminating statements on June 23rd, also knew that Agent Reed was forwarding those fabricated statements to the USAO in order to encourage the prosecutor to authorize prosecution. Yet Agent Fernandez did not intervene. That is also enough to expose Agent Fernandez to liability. See O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir.1988).

[23] Agent Lattuca relies instead on the Second Circuit's summary order in Pacicca v. Stead, 456 F. App'x 9 (2d Cir. 2011), in which the court upheld a jury charge on causation that included the following language: "if the public prosecutor relies on information conveyed by the officer that the officer knows is false and has no other independent basis for prosecuting the case, the officer is liable for causing the prosecution." Id. at 12. But the "independent basis" the court was referring to was the fact that the prosecutor had independently consulted with the complaining witness and therefore could not have relied on the officer's recitation of that witness's statements, even if that recitation were false. Id. Here, the USAO had no such "independent" basis for the prosecution, and the evidence in this case clearly shows that the prosecutor relied on Lattuca and the other defendants' allegations that Mr. Morel had made incriminating statements. In any event, Pacicca, which affirmed a jury verdict, did not hold that the Court may decide as a matter of law on summary judgment what effect fabricated evidence had on the prosecution when there is conflicting evidence on that point. See Defs.' Br. at 19. The law is otherwise. See, e.g., Tabaei v. N.Y.C. Health & Hosp. Corp., No. 11 Civ. 2013 (JSR), 2012 WL 5816882, at *4 (S.D.N.Y. Nov. 14, 2012).

fact as to whether the incriminating statements were material to the prosecution. See Cameron v. City of N.Y., 598 F.3d 50, 64 (2d Cir. 2010) (police officer who "fabricated evidence and forwarded that evidence to a prosecutor (who used it against a defendant) would [be] liable for the consequences of his misconduct" (citation omitted)).

2.  Defendants' Argument That They Had Probable Cause To Initiate And Continue The Prosecution Of Mr. Morel As A Matter Of Law Is Flawed On Numerous Levels

a.  The Presumption Of Probable Cause Created By The Indictment Can Be, And Is, Rebutted Here

Although the indictment creates a presumption of probable cause for the prosecution, that presumption may be rebutted by evidence "that the indictment was produced by fraud, perjury, the suppression of evidence or other police misconduct undertaken in bad faith." Boyd, 336 F.3d at 76; accord Colon v. City of N.Y., 60 N.Y.2d 78, 83 (1983). Here, as discussed above, there is direct evidence that this indictment resulted from "fraud, perjury . . or other police misconduct undertaken in bad faith," namely Reed's false testimony to the grand jury that Mr. Morel had made incriminating statements.   Specifically, the record includes a portion of the grand jury transcript showing that Reed testified before the grand jury that Mr. Morel "stated, in sum and substance, that an individual named Daniel paid him $5,000 to pick up the shipment which he knew to contain drugs, although he didn't know what type." Pl.'s 56.1 ¶¶ 128-29. Reed admitted in his deposition that this excerpt appeared to be an accurate record of his grand jury testimony. Reed also acknowledges that he was the only witness to testify concerning Mr. Morel before the grand jury. Thus, the presumption is rebutted. See Boyd, 336 F.3d at 77.[24]

---

[24] See McClellan v. Smith, 439 F.3d 137 (2d Cir. 2006) (sufficient evidence to rebut the presumption); Manganiello v. City of N.Y., 612 F.3d 149, 163 (2d Cir. 2010) (same); Matthews v. City of N.Y., 889 F. Supp. 2d 418, 440 (E.D.N.Y. 2012) ("[T]he alleged coerced confession was almost certain to persuade the grand jury to indict Matthews, satisfying the materiality requirement.").

Rather than contend that Mr. Morel lacks evidence of fraud or perjury before the grand jury, defendants argue that the Supreme Court's recent decision in Rehberg v. Paulk, 132 S. Ct. 1497 (2012), renders false testimony to the grand jury "insufficient to overcome the presumption of probable cause." Defs.' Br. at 20.[25] Rehberg does not support defendants' position.[26]  First, Rehberg would be applicable only to Mr. Morel's claim against Agent Reed who was the only witness to testify before the Grand Jury.  However, Mr. Morel's claim is not "based on" his testimony before the grand jury; it is "based on" his conduct outside the grand jury room, for which Agent Reed does not enjoy absolute immunity.  Courts in this Circuit have consistently rejected the argument that malicious prosecution claims "based on more than false grand jury testimony" by the defendant officer are barred by Rehberg. See Del Col v. Rice, No. 11 CV 5138(MKB), 2012 WL 6589839, at *14 & n.19 (E.D.N.Y. Dec. 18, 2012); Coggins v. Cnty. of Nassau, -- F. Supp. 2d --, No. 07-CV-3624 (JFB)(AKT), 2013 WL 6224631, at *7 (E.D.N.Y. Dec. 2, 2013); Tabaei v. N.Y.C. Health & Hosp. Corp., No. 11 Civ. 2013 (JSR), 2012 WL 5816882, at *7 n.5 (S.D.N.Y. Nov. 14, 2012).[27] Were it otherwise, police defendants could

---

[25] In any event, there is other evidence that the indictment was procured by fraud, perjury, or other bad faith police misconduct. Agent Reed made false statements not only before the grand jury but in the criminal complaint and in his and Lattuca's conversations with the prosecutor when the decision to authorize prosecution was made. Such outside-the-grand-jury-room evidence is sufficient to rebut the presumption. See Manganiello, 612 F.3d at 162 ("Where there is some indication in the police records that, as to a fact crucial to the existence of probable cause, the arresting officers may have 'lied in order to secure an indictment,' . . . the presumption of probable cause created by the indictment may be overcome.") (citation omitted, emphasis added)); Boyd, 336 F.3d at 77 (same).

[26] Cf. Murphy, 118 F.3d at 948 ("the presumption is not irrebuttable . . . [and] had defendants raised this issue . . . [plaintiff] would have been entitled to present rebutting evidence").

[27] Compare Del Col, 2012 WL 6589839, at *14 n.19 (distinguishing between those defendants who did "more than falsely testify at the grand jury," who were not entitled to absolute immunity, and those whose only alleged wrongdoing was in the grand jury room, who were); Hewitt v. City of N.Y., No. 09 CV 214 (RJD)(MDG), 2012 WL 4503277, at *8 (E.D.N.Y. Sept. 28, 2012) (distinguishing Sankar on grounds that in Sankar the police defendant's grand jury testimony "paralleled the information contained in his sworn complaint and provided to the prosecution," whereas in Hewitt "UC-55 was forthright in laying the groundwork for an indictment" so "any liability would be based solely on his less-than-forthright grand jury testimony, for which he enjoys absolute immunity").

Similarly, it is apparent from the face of Judge Scheindlin's order in Blasini v. City of N.Y., No. 11 Civ. 3022 (SAS), slip op. (S.D.N.Y. Apr. 18, 2012), that plaintiffs in that case also sought to establish liability "based on" defendants' grand jury testimony. See id. ("According to [the complaint], defendants violated [plaintiff's] civil rights by maliciously providing false testimony to a grand jury, obtaining an indictment against him, and then arresting him on that indictment." (emphasis added)). Thus, Blasini does not support defendants' arguments here.

"escape liability" for malicious prosecution claims based on "their involvement in laying the groundwork for an indictment," merely by "securing an appearance before a grand jury." Sankar v. City of N.Y., No. 07 CV 4726(RJD)(SMG), 2012 WL 2923236, at *3 (E.D.N.Y. July 18, 2012). Defendants' attempt to "convert grand jury testimony into an all-purpose shield from malicious prosecution liability" is "unpersuasive," id. at *3, and patently not what the Supreme Court intended. See Rehberg, 132 S. Ct. at 1507 n.1 ("Of course, we do not suggest that absolute immunity extends to all activity that a witness conducts outside of the grand jury room." (emphasis in original)). Second, Rehberg has no application to defendants other than Reed. See Frederick v. City of N.Y., No. 11 Civ. 469(JPO), 2012 WL 4947806, at *4 (S.D.N.Y. Oct. 11, 2012) (holding that Rehberg bars the use of a witness's grand jury testimony to support a claim against that witness but not against third parties).[28]

   b.  In The Malicious Prosecution Context, "Probable Cause" Means Probable Cause To Believe The Prosecution Could Succeed, Which Defendants Lacked Here

As defendants concede, the Second Circuit has squarely held that "probable cause" in the malicious prosecution context differs from that in the false arrest context. Defs.' Br. at 19. For a malicious prosecution claim, plaintiff need only show that defendants lacked "probable cause to believe the prosecution of [plaintiff] could succeed." Boyd, 336 F.3d at 76 & n.7 (so holding after surveying New York cases). Nonetheless, defendants improperly conflate the probable-cause-to-arrest and probable-cause-to-prosecute standards. See Defs.' Br. at 19, 21-22 (arguing that once probable cause to arrest is established, there is probable cause for the prosecution unless new facts came to light that undermined that probable cause). Compare Posr v. Court Officer Shield No. 207, 180 F.3d  409, 417 (2d Cir. 1999) ("The defendants seem to conflate

---

[28] Moreover, the Second Circuit has recently held that Rehberg does not bar all uses of an officer's grand jury testimony in civil rights actions against that officer. See Marshall v. Randall, 719 F.3d 113, 115-18 (2d Cir. 2013) (upholding malicious prosecution verdict where plaintiff used grand jury testimony at trial to impeach officers).

probable cause to arrest with probable cause to believe that Posr could be successfully prosecuted.  Only the latter kind of probable cause is at issue with respect to the malicious prosecution claim . . . ."); <u>Sankar</u>, 867 F. Supp. 2d at 311 ("The determination of probable cause to <u>prosecute</u> is distinct from probable cause to <u>arrest</u> . . . . ) (citing <u>Boyd</u>) (emphasis in original)); <u>Mejia v. City of N.Y.</u>, 119 F. Supp. 2d 232, 254 (E.D.N.Y. 2000) (same). [29]

The difference is illustrated by the Second Circuit's decision in <u>Boyd</u>, where the court found that defendant police officers had probable cause to arrest and cited no intervening facts dissipating that probable cause. <u>Boyd</u>, 336 F.3d at 75-76. Nevertheless, the court found that, because a reasonable juror could conclude that the police knew that incriminating statements were made by the plaintiff before he was given <u>Miranda</u> warnings and allegedly lied about the circumstances in which those statements were made in order to prevent the incriminating statements from being suppressed at trial, there was a genuine issue as to whether the police had probable cause to believe the prosecution could succeed. <u>See id.</u> at 76-77. As <u>Boyd</u> makes clear, the probable cause standard in this context is not satisfied simply by a reasonable belief that the plaintiff is guilty in the abstract. The police officers in <u>Boyd</u> could reasonably have believed the plaintiff to be guilty based on his incriminating statements to them.  Rather, the proper inquiry is whether the police had probable cause to believe that prosecution would be authorized and that the plaintiff would be found guilty beyond a reasonable doubt based on admissible evidence at trial – otherwise, probable cause to believe the prosecution could "succeed" would be lacking.

---

[29] That courts sometimes note in <u>dicta</u> that if probable cause existed at the time of arrest probable cause also existed for the prosecution "unless undermined by the discovery of some intervening fact," Defs.' Br. at 19 (citation omitted), does not change the applicable standard. In many cases, notably ones where there is no evidence of police perjury intended to cause the prosecution to go forward, once probable cause to arrest is established, probable cause to believe the prosecution could succeed will also be clear. But the Second Circuit has clearly held that this is not always true. Defendants also cite a First Department decision from over three decades ago for the proposition that a malicious prosecution claim can "only succeed 'where probable cause is clearly lacking.'" Defs.' Br. at 19 (quoting <u>Brown v. City of N.Y.</u>, 459 N.Y.S.2d 589, 591 (1st Dep't 1983)). The Second Circuit precedent discussed above supersedes this case and, in any event, the cited language is <u>dicta</u>. Moreover, as discussed below a reasonable juror could find that probable cause for the prosecution was clearly lacking.

Boyd is particularly instructive here where defendants felt the need to invent incriminating statements in order to secure authorization for the prosecution. As explained above, the USAO declined prosecution because of the lack of incriminating statements, and in response defendants fabricated incriminating statements.  A reasonable juror could easily conclude the defendants would not have fabricated incriminating statements if they felt they could successfully prosecute Mr. Morel without them.

Even indulging in defendants' alternative-universe argument that the already-declined prosecution would have somehow proceeded in the absence of the fabricated incriminating statements, there is still no basis in this record to find as a matter of law that there was probable cause to believe that such a hypothetical prosecution could have succeeded. As defendants concede, facts learned by defendants subsequent to the arrest may not be ignored. Lowth, 82 F.3d 571-72. Here, in addition to all of the reasons they lacked probable cause at the time of the arrests at issue, a reasonable juror could find that defendants took steps to initiate and continue the prosecution despite learning, inter alia, of the total lack of evidence incriminating Mr. Morel in any way uncovered by the extensive DEA investigation which resulted in the arrests of the actual criminals behind the narcotics smuggling conspiracy while Mr. Morel was awaiting trial. On these facts, a reasonable juror could conclude that the officers lacked probable cause to believe a prosecution against Mr. Morel would succeed.

### 3.   A Reasonable Juror Could Find That Defendants Acted With The Requisite Malice

When a Court finds on summary judgment that there is a genuine issue of fact as to whether there was probable cause to believe the prosecution could succeed, the issue of malice is for the jury. See, e.g., Boyd, 336 F.3d at 78 ("Once we find an issue of material fact as to probable cause, the element of malice also becomes an issue of material fact as well."); Ricciuti, 124 F.3d at 131 (same); Rounseville v. Zahl, 13 F.3d  625, 631 (2d Cir. 1994) (same); Llerando-

Phipps, 390 F. Supp. 2d at 383 (same); Mejia, 119 F. Supp. 2d at 253 (same); Richardson, 2006

WL 2792768, at *5 (same); Matthews, 889 F. Supp. 2d at 438 (same). [30]

    Here, in addition to the lack of probable cause, there is evidence from which a juror

could conclude that defendants acted maliciously in initiating and continuing the prosecution,

most notably the alleged confession that defendants concede for purposes of this motion that they

fabricated.[31] See Cameron, 598 F.3d at 69 (reasonable jury could find that defendants who

provided false information to a prosecutor were conscious of their alleged wrongdoing and hence

acted maliciously).

## III.   DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

    The Bivens defendants argue that they are entitled to summary judgment on Mr. Morel's

false arrest and malicious prosecution claims under the doctrine of qualified immunity. They

concede that the right to be free from arrest and prosecution without probable cause was "clearly

established" at all relevant times. See Defs.' Br. at 23.[32] Thus, in this context, the affirmative

defense[33] of qualified immunity is available on summary judgment only if "the undisputed facts

and all permissible inferences favorable to the plaintiff show . . . that officers of reasonable

competence could disagree on whether the probable cause test was met." McClellan, 439 F.3d at

---

[30] The cases that defendants cite do not assist them: those decisions rely in turn on Martin v. City of Albany, 42
N.Y.2d 13 (1977), in which the New York Court of Appeals specifically held that, as malice is "seldom established
by direct evidence of an ulterior motive," a jury presented with no evidence as to malice "may, but is not required to,
infer the existence of actual malice from the fact that there was no probable cause to initiate the proceeding." Id. at
17. In so holding, the court referenced "totally lacking" only in dicta when it observed that "probable cause to
initiate a criminal proceeding may be so totally lacking as to reasonably permit an inference that the proceeding was
maliciously instituted." Id. That probable cause "may" be so totally lacking as to raise an inference of malice
without any other evidence suggesting malice does not mean that malice may be inferred "only" when it is so
lacking.
[31] "Showing malice under New York law in this context 'does not require a plaintiff to prove that the defendant was
motivated by spite or hatred.'" Rounseville, 13 F.3d at 630 (citation omitted). "New York courts recognize that
actual malice rarely can be established through direct evidence and thus may be proven through circumstantial
evidence." Id. at 630-31 (citing Martin).
[32] See Weyant, 101 F.3d at 858 (freedom from false arrest clearly established); Manganiello, 612 F.3d at 164
(freedom from malicious prosecution clearly established).
[33] See Zellner, 494 F.3d at 368.

147-48 (emphasis in original, citation omitted).[34] For the same reasons discussed above, there are material issues of fact (including whether defendants unreasonably detained Mr. Morel for eight hours following the declination of prosecution and whether defendants then fabricated evidence and forwarded it to the prosecutor) concerning whether officers of reasonable competence could agree that there was probable cause to arrest and prosecute Mr. Morel. Because the underlying facts are disputed, "the matter of the officers' qualified immunity therefore cannot be resolved as a matter of law." Weyant, 101 F.3d at 858.

## CONCLUSION

For the foregoing reasons, defendants' summary judgment motion should be denied.

Dated: New York, New York
       February 18, 2014

Respectfully submitted,

CLEARY, GOTTLIEB, STEEN & HAMILTON LLP

By: _____
    Avram E. Luft

One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Attorneys for Plaintiff*

Of Counsel:
       Jacqueline M. Moessner
       Sheryl B. Shapiro
       Mark E. McDonald
       A. Chinyere Ezie

---

[34] Moreover, because "[i]t is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer," Zahrey v. Coffey, 221 F.3d 342, 355 (2d Cir. 2000), qualified immunity is similarly no defense to a malicious prosecution claim on summary judgment where there is a genuine dispute as to whether defendants fabricated evidence depriving plaintiff of his liberty, unless defendants could somehow show that "officers of reasonable competence could disagree" on whether such conduct was lawful. Defendants here do not attempt such an unlikely showing.

**APPENDIX A**

**EXAMPLES OF INCONSISTENT OR CONFLICTING TESTIMONY
BY AGENTS LATTUCA AND REED**

| Testimony | Inconsistent Testimony |
|---|---|
| *Testimony Concerning the alleged confession on June 21, 2009* | |
| Agent Lattuca testified that Mr. Morel confessed to knowing about drugs at the beginning of Agent Reed and Lattuca's second interview with Mr. Morel. Ex. 7, Lattuca Dep. Tr. at 134:7-137:15. | Agent Reed testified that Mr. Morel confessed to knowing about drugs later in that second interview, after Agents Lattuca and Reed had moved Mr. Morel to a different room. Ex. 9, Reed Dep. Tr. at 95:4-97, 113:15-114:19. |
| Agent Lattuca testified that Mr. Morel made the confession after Agent Lattuca pressed him on his alleged statement that he was going to be paid $5,000 for picking up the shipment, which Mr. Morel had mentioned in the initial interview. Ex. 11, Supp. H'rg Tr. at 105:15-25 (Lattuca). | Agent Reed testified that Mr. Morel had not mentioned that he was going to be paid $5,000 for picking up the shipment until at some point in the second interview (i.e., had <u>not</u> mentioned that during the first interview). Ex. 9, Reed Dep. Tr. at at 95:25-96:6. Agent Reed did not remember Mr. Morel responding to Lattuca's pressing him on his alleged statement that he was going to be paid $5,000. <u>Id.</u> at 97:17-98:24. |
| At the suppression hearing (where the admissibility of the alleged confession was in issue), Agent Lattuca testified that Mr. Morel confessed to knowing about drugs <u>before</u> Mr. Morel asked for an attorney. Ex. 11, Supp. Hr'g Tr. at 112:3-113:7 (Lattuca). Agent Lattuca also testified that Mr. Morel's request for an attorney was prompted by Agent Lattuca's questions "about other people that were involved" with the drug smuggling venture." <u>Id.</u> | In his deposition (where the admissibility of the alleged confession was no longer in issue), Agent Lattuca testified that Mr. Morel confessed to knowing about drugs <u>after</u> Mr. Morel asked for an attorney. Ex. 7, Lattuca Dep. Tr. at 135:13-137:15. Agent Lattuca also testified that Mr. Morel's request for an attorney was prompted by Agent Lattuca's questions about why he was to be paid $5,000 for picking up the shipment. <u>Id.</u> |
| *Testimony Concerning the alleged confession on June 23, 2009* | |
| At the suppression hearing, Agent Reed testified that in the interview on June 23rd Mr. Morel "recanted" his confession by asserting that he had not known anything about narcotics, and he was placed under arrest "at that point." Ex. 11, Supp. Hr'g Tr. at 38:23- | At Mr. Morel's criminal trial (after Judge Matsumoto suppressed the alleged confession on June 21st because defendants violated Mr. Morel's right to counsel, but allowed in any statements Mr. Morel made on June 23rd because he was not then "in custody"), Agent |

| Testimony | Inconsistent Testimony |
|---|---|
| 39:14 (Reed). | Reed for the first time testified that Mr. Morel, rather than recanting his confession, actually repeated it on June 23rd, and he was not arrested until later when it was determined that he could not or would not assist with the investigation. Ex. 12, Trial Tr. at 144:6-24 (Reed). |
| *Testimony concerning Mr. Morel's alleged lack of candor in the initial interview.* | |
| In his deposition, Agent Lattuca testified that in the initial interview Mr. Morel did <u>not</u> mention Felix as someone from Green Market who had hired him, but he <u>did</u> mention Daniel. Ex. 7, Lattuca Dep. Tr. at 91:14-19. | Agent Reed testified in his deposition that in the initial interview Mr. Morel <u>did</u> mention Felix as someone from Green Market who had hired him, Ex. 9, Reed Dep. Tr. at 68:10-18, but did <u>not</u> mention Daniel until the second interview. Id. at 99:10-16. |
| In his deposition, Agent Lattuca testified that "another reason why I think [Mr. Morel] had given me the response regarding making 120-, $130,000 a year with the cable company" was to give Lattuca the impression that "he didn't have financial troubles, so there was no reason for him to do something like this." Ex. 7, Lattuca Dep. Tr. at 161:22-162:8. | Earlier in the same deposition, Agent Lattuca had testified that he remembered Mr. Morel "saying he wanted a second job or needed it." Ex. 7, Lattuca Dep. Tr. at 81:14-18.<br><br>When asked again, after having just testified that he thought Mr. Morel wanted to give him the impression that he did not have financial troubles, Lattuca was asked: "You recall Mr. Morel saying he wanted a second job?" His response: "I do not." <u>Id.</u> 162:9-13. |
| At Mr. Morel's criminal trial, Agent Lattuca testified that he ended the initial interview by asking Mr. Morel "if he knew that he was going to pick up drugs, just like that. At that point he did not answer the question immediately, kind of looked down, looked away from me, and then eventually he said no. . . . At that point, I terminated the interview." Ex. 12, Trial Tr. at 110:21-25 (Lattuca). | In his deposition, Agent Lattuca testified that he ended the initial interview by explaining to Mr. Morel "that if he was dishonest with us, we were still going to conduct the interviews with the other individuals who may very well tell us the truth and implicate him, and basically let him know that this was his last chance to come clean and tell us what was going on. And at that point, he told us he was telling the truth, and I decided to terminate the interview at that point." Ex. 7 Lattuca Dep. Tr. at 80:4-22. |

| Testimony | Inconsistent Testimony |
|---|---|
| ***Testimony regarding Mr. Morel's alleged statements about dropping off the shipment in a dumpster under surveillance by spotters.*** | |
| Agent Lattuca testified that Mr. Morel stated in interviews that he was supposed to drop off the shipment in a "dumpster," and that others would "take care" of it from there. Ex. 11, Supp. Hr'g at 103:20-104:3 (Lattuca). Agent Lattuca also testified that Mr. Morel explained that the dumpster was under surveillance by "spotters." Ex. 7, Lattuca Dep. Tr. at 137:16-138:11. | At Agent Reed's deposition, Agent Reed asked if Mr. Morel said anything about a dumpster being under "surveillance." Agent Reed answered, "No." Nor did he recall Mr. Morel saying anything about "spotters." Ex. 9, Reed Dep. Tr. 117:4-17. |
| ***Testimony concerning the alleged "cold hit."*** | |
| Agent Lattuca testified that the seizure of narcotics in the June 21 Shipments was a "cold hit." Ex. 7, Lattuca Dep. Tr. at 48:5-49:2. Even when DEA agents requested that ICE turn over the investigation to them, after explaining how they had provided the intelligence that led to the seizure, Lattuca refused to turn over the investing claiming he did not "see any nexus to a DEA case." Id. at 62:10-21. | When asked whether she agreed that the seizure of narcotics in the June 21 Shipments by CBP and ICE was a "cold hit," DEA Agent Miller responded, "No." Ex. 3, Miller Dep. Tr. at 169:10-170:12. Agent Miller testified that ICE and CBP had only seized the narcotics because the DEA had "notified them there was a pending shipment coming in." Id. at 170:13-20. |